UNITED STATES of America,
Plaintiff,

v.

Leonard JOHNSON, et al., Defendants.

No. CR–3–00–032 (1–3).

United States District Court,
S.D. Ohio,
Western Division.

Dec. 19, 2000.

Sheila G. Lafferty, Dayton, OH, Sharon Zealey, Cincinnati, OH, for Plaintiff.

Vincent P. Popp, John H. Rion, Lawrence J. Greger, Dayton, OH, for Defendants.

---

DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN PART MOTION OF DEFENDANT JESUS NAVIREZ–RAMIREZ TO SUPPRESS EVIDENCE (DOC. # 20); DECISION AND ENTRY OVERRULING MOTION OF DEFENDANT LEONARD JOHNSON TO SUPPRESS EVIDENCE (DOC. # 22); DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN PART MOTION OF DEFENDANT NORMAN SOSA–RAMIREZ TO SUPPRESS EVIDENCE (DOC. # 23); CONFERENCE CALL SET.

RICE, Chief Judge.

The three Defendants are charged in Count 1 of the Indictment (Doc. # 10) with conspiring to possess with intent to distribute marijuana, in violation of 21 U.S.C. § 846. In addition, Defendant Leonard Johnson ("Johnson") is charged in Count 2 with distributing marijuana, in violation of 21 U.S.C. § 841(a), while Defendants Jesus Navirez–Ramirez ("Navirez–Ramirez") and Norman Sosa–Ramirez ("Sosa–Ramirez") are charged in Count 3 of the Indictment with possessing with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a). This case is now before the Court on motions filed by the Defendants, seeking the suppression of evidence. *See* Doc. # 20 (Navirez–Ramirez); Doc. # 22 (Johnson); and Doc. # 23 (Sosa–Ramirez). On June 28, 2000, the Court conducted an oral and evidentiary hearing on those motions. In accordance with this Court's Entry (Doc. # 31), the parties have filed their post-hearing memoranda. *See* Docs. ## 33 and 37–41.

With their motions, Navirez–Ramirez and Sosa–Ramirez seek the suppression of evidence that was seized, on March 6, 2000, from Room 111 at the Knights Inn, located at the corner of Maxton and Miller Avenues in Montgomery County, Ohio. With his motion, Johnson seeks the suppression of evidence that was seized on the same date from his residence located at 714 Kirk Lynne Street, Dayton, Ohio.[1] The Defendants argue that the searches violated their rights under the Fourth Amendment. According to the Government, those two searches were permissible under the Fourth Amendment, pursuant to an anticipatory search warrant which Magistrate Judge Michael Merz issued on March 6, 2000, expressly authorizing officers to search 714 Kirk Lynne Street, if certain conditions precedent were met. That search warrant was obtained on the basis

---

1. With his motion, Johnson also requests that the Court suppress any statements he may have made to officers on March 6, 2000, when 714 Kirk Lynne Street was searched. According to Johnson, his statements must be suppressed under the fruit-of-the-poisonous-tree doctrine, the poisonous tree being the illegal search of 714 Kirk Lynne Street. Johnson does not contend that the officers violated *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), by interrogating him, or that his statements were otherwise involuntary. Therefore, this Court need not address Johnson's request to suppress his statements, unless and until it concludes that the search of 714 Kirk Lynne Street violated his rights under the Fourth Amendment.

of an affidavit executed by Officer Larry Hunt ("Hunt") of the Dayton Police Department, who was then assigned to a Drug Enforcement Administration ("DEA") Task Force. The Court begins its analysis by reviewing the information set forth in Hunt's affidavit.[2]

On March 1, 2000, United States Border Patrol Agent R. Friess ("Friess") was assigned to the El Paso, Texas, DEA Airport Task Force. Hunt Affidavit (Government Exhibit 1) at ¶ 3. Friess and his drug detection dog, Rex, were checking outbound freight at a facility of the United Parcel Service, when Rex alerted on two cardboard boxes, each measuring approximately $20'' \times 20'' \times 20''$. Id. The two boxes were addressed to Johnson at 714 Kirk Lynne Street, Dayton, Ohio.[3] Id. Friess gave the boxes to DEA Airport Task Force Officer Armando Sosa ("Sosa"), who obtained a search warrant for them. Id. at ¶¶ 3–4. When he opened the two boxes, Sosa discovered 56.35 pounds of suspected marijuana. Id. at ¶ 4. On March 2, 2000, Sosa relayed the above information to Detective Kevin Bollinger ("Bollinger") of the Dayton Police Department. Id. at ¶ 3. Sosa also transferred custody of the two cardboard boxes to Postal Inspector Antonio Sifuentes, who, in turn, arranged to have them shipped, via the United States Postal Service, to Postal Inspector Suzanne McDonough ("McDonough") at the Dayton International Airport. Id. at ¶¶ 5–6. When the two cardboard boxes containing suspected marijuana arrived at that facility, McDonough gave them to Bollinger. Id. at ¶ 7. The suspected marijuana was then transported to the Miami Valley Regional Crime Lab, where it was weighed and tested positive for that controlled substance. Id. at ¶ 8. In addition, on March 2 and 3, 2000, Bollinger observed a 1986 Ford Bronco, which was registered to Johnson, parked in the driveway at 714 Kirk Lynne Street. Id. at ¶ 9. McDonough learned that Johnson received mail at that address. Id. at ¶ 10.

In his affidavit, Hunt explained that based upon his training and experience, drug traffickers oftentimes ship controlled substances to addresses other than the ultimate intended destination. Id. at ¶ 11. Employing such a tactic permits drug traffickers to ascertain whether law enforcement officers are watching the premises to which the controlled substances have been shipped and to take evasive action in such an eventuality, thereby concealing the ultimate destination for and the ultimate recipient of the contraband. Id. To effect such a tactic, drug traffickers will frequently employ the assistance of other individuals for the sole purpose of receiving such shipments and transporting them to their ultimate destination. Id. Hunt explained that the officers intended to make a controlled delivery of the boxes to 714 Kirk Lynne Street, and he expressly requested, in his affidavit, permission to install an electronic monitoring or tracking device in each of the cardboard boxes.[4]

---

2. The search warrant, the application for same and Hunt's affidavit are Government Exhibit 1.

3. The return address for the two boxes was a Mail Boxes Etc., located in El Paso.

4. In the application for the search warrant (as opposed to Hunt's affidavit attached thereto), the Government did not expressly state that it was seeking judicial approval to install monitoring or tracking devices in the two packages. See Government Exhibit 1. Although Hunt testified that he relied upon the search warrant as authorization for the installation of those devices, the search warrant itself did not mention the monitoring or tracking devices. Nevertheless, since no Defendant has remotely suggested that the installation of the monitoring or tracking devices violated his or anyone else's rights under the Fourth Amendment, it is unnecessary for the Court to decide

*Id.* at ¶ 12. When one of the boxes was opened, the device would activate and alert monitoring agents by emitting a more frequent tone (two tones per second, as opposed to one tone every five seconds when a box remained closed).[5] *Id.* According to Hunt, unless electronic tracking devices were installed in the packages, their contents would in all likelihood be lost or destroyed as a result of being moved elsewhere or being consumed. *Id.* at ¶ 14. Hunt indicated that he and other officers of the DEA Task Force would attempt to make a controlled delivery of the two cardboard boxes containing marijuana to 714 Kirk Lynne Street, on March 6, 2000, and postulated that upon the successful delivery of the two boxes to that address, probable cause to search the premises would exist. *Id.* at ¶ 15. Thus, Hunt indicated that the search warrant would not be executed, unless the parcels had been delivered to *and* taken inside of 714 Kirk Lynne Street. *Id.*

In ¶¶ 16–17 of his affidavit, Hunt addressed the possibility of the cardboard boxes being taken inside 714 Kirk Lynne Street and then being moved from that location, without the monitoring devices indicating that one or both of the boxes had been opened:

16. In the event that the [cardboard boxes] are taken inside [714 Kirk Lynne Street] and then removed before activation of either of the monitoring devices, a search of the residence is still necessary to obtain evidence of narcotics trafficking. It has been the affiant's experience that drugs, drug paraphernalia, drug records, and/or illegally derived monies are commonly located inside these delivery sites.

17. If the [cardboard boxes] are removed from [714 Kirk Lynne Street] without the monitoring device being activated and taken to another location, it will be necessary to enter the structure, place or vehicle in which the [cardboard boxes] are situated when the device has been activated, [when] the device ceases to transmit its monitor signal, [when] it appears at great risk of being lost or destroyed (sic), or [when] it appears probable by visual and/or electronic observation that the transportation of the [cardboard boxes] and [their] conten[t]s outside the Southern District of Ohio is imminent. Such entry will be for the sole purpose of recovering the [cardboard boxes], the monitoring devices and the contents of the [cardboard boxes] before they can be destroyed, secreted, consumed and/or transported to another individual.

Government Exhibit 1.

On the basis of Hunt's affidavit, Magistrate Judge Merz, at 8:40 a.m., March 6, 2000, issued a search warrant, permitting any special agent of the DEA or other authorized officer of the United States to search 714 Kirk Lynne Street. *See* Government Exhibit 1. That search warrant did not expressly authorize officers to search any other location. *Id.*

Officers installed monitoring or tracking devices in the two cardboard boxes containing marijuana, prior to delivering them to 714 Kirk Lynne Street. Transcript of June 28, 2000 Hearing (Doc. # 32) at 19. Those devices emitted a tone which could be heard on police radios. If the boxes remained closed, a device would sound one tone every five seconds. *Id.* at 13. If they were opened, the frequency of the tone

whether the search warrant constituted judicial authorization for their installation.

5. According to Hunt's affidavit, the monitoring or tracking devices would not permit officers to overhear any conversations.

would increase to twice a second. *Id.* In addition to installing the monitoring or tracking devices, the contents of the boxes were sprayed with a substance referred to as "clue spray." *Id.* at 19. That substance is a clear liquid which dries to a power that can be seen under ultraviolet light. *Id.*

At approximately 11:00 a.m., on March 6, 2000, Dayton Police Department Detective Gary Gabringer ("Gabringer"), dressed as a supervisor employed by the United Parcel Service, delivered the two cardboard boxes to 714 Kirk Lynne Street. *Id.* at 20. Gabringer gave the boxes to an individual who was later identified as Johnson. *Id.* at 21. That Defendant signed for the boxes and carried them into 714 Kirk Lynne Street. *Id.* The officers did not, at that point, execute the search warrant, although the warrant gave them authorization to do so. Rather, they listened to the monitoring or tracking devices, in order to ascertain whether one or both of the packages had been opened, an event which did not occur while the boxes were at 714 Kirk Lynne Street. *Id.* at 22. A little more than 30 minutes after Gabringer had delivered the boxes, the officers observed Johnson and another male, who was later identified as Sosa–Ramirez, carry the packages from 714 Kirk Lynne Street and place them in the back seat of a red Mazda, which was parked along the curb outside that residence. *Id.* Around noon, an individual, who was later identified as Navirez–Ramirez, arrived at 714 Kirk Lynne Street, driving a black Cadillac. *Id.*

Navirez–Ramirez entered that residence and remained therein for a brief period of time, after which he left with Sosa–Ramirez.[6] *Id.* at 22–23. Some of the officers followed the two Defendants as they traveled, ultimately, to the Knights Inn, located at the corner of Maxton and Miller Avenues, in Montgomery County, Ohio, arriving at the establishment at approximately 1:15 p.m.[7] *Id.* at 24 and Government Exhibit 4 at ¶ 15. The two Defendants parked in front of Room 111, and each of them carried one of the cardboard boxes containing marijuana into that room. Doc. # 32 at 24. In a matter of minutes, Navirez–Ramirez and Sosa–Ramirez left Room 111, and drove away together in the black Cadillac, without the boxes. *Id.*

While the two Defendants were away from the Knights Inn,[8] Hunt contacted the Butler Township Police Department and requested the assistance of an officer from that Department. In response to that request, Butler Township Police Sergeant Plummer ("Plummer") traveled to that motel. *Id.* at 25. Plummer contacted employees of the Knights Inn, and was told by them that Navirez–Ramirez had rented Room 111 on March 2, 2000. The employees also gave Plummer a passkey for that motel room. *Id.* At around 2:45 p.m., Navirez–Ramirez and Sosa–Ramirez returned to the Knights Inn and went into Room 111.[9] *Id.* and Government Exhibit 4 at ¶ 16. Two to three minutes later, the monitoring devices activated, indicating that the

**6.** Navirez–Ramirez drove away from 714 Kirk Lynne Street in the black Cadillac, while Sosa–Ramirez left in the red Mazda. Those two Defendants were the only occupants of those two vehicles.

**7.** Other officers remained at 714 Kirk Lynne Street, where they continued surveillance on that structure.

**8.** Officers had followed Navirez–Ramirez and Sosa–Ramirez when they left the Knights Inn.

**9.** No one had entered Room 111, while the two Defendants had been away.

two cardboard boxes had been opened. Doc. # 32 at 25–26.

When the devices sounded, Hunt ordered the other officers to enter Room 111, with Plummer, who was dressed in his uniform, leading the entry team. *Id.* at 26. He knocked on the door and loudly announced that police officers were there to serve a search warrant. *Id.* When no one inside the room responded, he knocked again, and, after the passage of approximately 60 seconds, used the passkey given to him be employees of the Knights Inn to open the door. *Id.* As Plummer started to open the door, the occupants of Room 111 (Navirez–Ramirez and Sosa–Ramirez) attempted to push it shut. *Id.* at 27. At that point, other officers joined with Plummer, and, together, they succeeded in forcing the door open. *Id.* Upon entering the motel room, Hunt saw the open cardboard boxes and bricks of marijuana strewn about the floor. *Id.* at 27–28. Navirez–Ramirez and Sosa–Ramirez were then arrested. *Id.* at 28. Pursuant to Hunt's instructions, no property was removed from Room 111, and the officers did not search it. *Id.* at 28, 45. Hunt asked Bollinger to retrieve an ultraviolet light, which could be used to examine the two Defendants' hands for the presence of clue spray. *Id.* at 28. The examination revealed the presence of that substance on their hands. *Id.* at 29. The officers then escorted those two Defendants from Room 111, after which it was secured with no one remaining inside.

At approximately 3:20 p.m., Hunt left the Knights Inn and returned to his office, where he drafted a second affidavit, in order to obtain a search warrant for Room 111. Hunt's second affidavit (Government Exhibit 4) contains much of the same information as that contained in his first. Indeed, the first 11 paragraphs of each affidavit are identical. *See* pages 3–4, *supra.* Hunt's second affidavit also contains information about events which had occurred after he had executed his first affidavit. Thus, Hunt indicated in his second affidavit that, after monitoring devices had been installed in the two cardboard boxes, they were delivered to 714 Kirk Lynne Street and taken inside that residence. Government Exhibit 4 at ¶¶ 12–14. In his second affidavit, Hunt also explained that the boxes were subsequently transferred to the red Mazda, in which they were transported to the Knights Inn, where the boxes were moved to room 111, and that monitoring devices had sounded at approximately 2:45 p.m. *Id.* at ¶¶ 15–16. Therein, Hunt also stated that officers had entered Room 111, after the monitoring devices had activated, and that the boxes, the marijuana, the devices and the occupants of that room were secured. *Id.* at ¶ 16. At 5:15 p.m., on March 6, 2000, Judge Merz issued a search warrant for Room 111 at the Knights Inn. *See* Government Exhibit 4. Hunt returned to the Knights Inn, and that search warrant was executed, with the marijuana and other evidence being seized.

While the events relating to Room 111 were occurring, other officers continued surveillance at 714 Kirk Lynne Street. At 4:30 p.m., March 6, 2000, the search warrant for that residence was executed, with a shopping bag containing a plastic baggie of suspected marijuana and a portable scale being seized. *See* Government Exhibit 1.

As is indicated above, Johnson argues that the Court must suppress the evidence that was seized from 714 Kirk Lynne Street, while Navirez–Ramirez and Sosa–Ramirez contend that this Court must suppress that which was seized from Room 111 at the Knights Inn.[10] As a means of

---

10. During the June 28, 2000, Hearing, John- son conceded that he did not have a reason-

analysis, this Court will initially discuss the execution of the search warrant at 714 Kirk Lynne Street, following which it will turn to the events which occurred at the Knights Inn. However, since the Defendants' motions raise the issue of whether the Court should suppress evidence which was seized in connection with the execution of the search warrants, the Court begins by setting forth the general standards which govern probable cause for the issuance of search warrants and the good faith exception to the exclusionary rule.

▮▮▮ In *United States v. Smith*, 182 F.3d 473 (6th Cir.1999), the Sixth Circuit restated certain fundamental principles that a court must apply when a defendant requests the suppression of evidence that had been seized when a search warrant was executed:

> The Fourth Amendment, which states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation," U.S. CONST. amend. IV, requires that probable cause be determined "by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out federal crime." *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948). In order for a magistrate to be able to perform his official function, the affidavit must contain adequate supporting facts about the underlying circumstances to show that probable cause exists for the issuance of the warrant. *Whiteley v. Warden*, 401 U.S. 560, 564, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971). Probable cause is defined as "reasonable grounds for belief, supported by less

than *prima facie* proof but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir.1990). It requires "only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 244 n. 13, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). A warrant must be upheld as long as the magistrate had a "substantial basis for ... conclud[ing] that a search would uncover evidence of wrongdoing...." *Id.* at 236, 103 S.Ct. 2317.

*Id.* at 476–77. See also, *United States v. Calloway*, 116 F.3d 1129, 1132 (6th Cir.), *cert. denied*, 522 U.S. 925, 118 S.Ct. 324, 139 L.Ed.2d 250 (1997); *United States v. Finch*, 998 F.2d 349, 352 (6th Cir.1993) ("Probable cause for the issuance of a search warrant is defined in terms of whether the affidavit sets out facts and circumstances which indicate a fair probability that evidence of a crime will be located on the premises of the proposed search.") (citation and internal quotation marks omitted). In *Illinois v. Gates*, 462 U.S. 213, 230, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the Supreme Court stressed that the existence of probable cause must be determined from the totality of the circumstances. When determining whether an affidavit demonstrates that probable cause to search a particular location existed, this Court must examine the totality of those circumstances in a "realistic and commonsense fashion." *United States v. Van Shutters*, 163 F.3d 331, 336 (6th Cir. 1998). Of course, this Court also must afford great deference to the determinations of probable cause made by the magistrate who issued the search warrants. *United States v. Allen*, 211 F.3d 970, 973

able expectation of privacy in the motel room and, thus, was without standing to seek the suppression of evidence seized from that room. *See* Doc. # 32 at 35. Likewise, neither Navirez–Ramirez nor Sosa–Ramirez has

claimed a reasonable expectation of privacy in 714 Kirk Lynne Street and, thus, argued in his post-hearing memorandum that this Court must suppress the evidence seized therefrom.

(6th Cir.2000) (*en banc* ); *United States v. Akram,* 165 F.3d 452, 456 (6th Cir.1999). Where, as in the present case, oral testimony was not presented to the issuing magistrate, the existence of probable cause to support the search warrants must be ascertained exclusively from the four corners of the affidavit. *See e.g., Whiteley v. Warden,* 401 U.S. 560, 565 n. 8, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); *United States v. Weaver,* 99 F.3d 1372, 1377 (6th Cir. 1996).

In *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Supreme Court modified the exclusionary rule "so as not to bar the admission of evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." *Id.* at 905, 104 S.Ct. 3405. *See also, United States v. Czuprynski,* 46 F.3d 560 (6th Cir.1995) (*en banc*). The *Leon* Court also held that the good faith exception to the exclusionary rule would not apply under the following circumstances, to wit: 1) when the search warrant was obtained in violation of *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); 2) when the issuing magistrate has failed to act in a neutral and detached fashion; 3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" and 4) when the warrant is so facially deficient (i.e., it fails to describe the particular place to be searched or the items to be seized) that the executing officers could not have reasonably presumed that it was valid. 468 U.S. at 923, 104 S.Ct. 3405. *See also, United States v. Leake,* 998 F.2d 1359, 1366 (6th Cir.1993).

## I. *714 Kirk Lynne Street*

■ In arguing that the Court must suppress the evidence that was seized from 714 Kirk Lynne Street, Johnson implicitly concedes that Hunt's first affidavit established probable cause to believe that evidence of criminal activity would be located within that residence, once the boxes containing marijuana had been delivered to and taken inside. Rather, Johnson focuses on post-delivery events, in particular, the removal of the boxes containing marijuana from his residence, before they had been opened, more than four hours prior to the execution of the search warrant. According to Johnson, probable cause to search 714 Kirk Lynne Street ceased to exist, once the boxes of contraband had been removed from those premises.[11] In response, the Government argues that Hunt's first affidavit established the existence of probable cause to search 714 Kirk Lynne Street, notwithstanding the removal of the boxes of marijuana from that residence before the search occurred. In addition, the Government contends that, even if Hunt's first affidavit failed to support the existence of probable cause, *Leon's* good faith exception to the exclusionary rule prevents the suppression of the evidence seized therein.

■ As is indicated above, Judge Merz issued an anticipatory search warrant for 714 Kirk Lynne Street, not to become effective unless and until the cardboard boxes containing marijuana were delivered to that residence and taken inside. Courts, including the Sixth Circuit, have repeatedly held that anticipatory search

11. Johnson also points out that the only information contained in Hunt's first affidavit, linking him to criminal activity, is the statement that two boxes containing in excess of 56 pounds of marijuana had been shipped to him. Therefore, his argument continues, there was no other information in that affidavit which could have established the existence of probable cause to search 714 Kirk Lynne Street once those boxes were removed from the premises.

warrants, such as that issued for 714 Kirk Lynne Street, are lawful under the Fourth Amendment, if certain triggering events occur. *See e.g., United States v. Loy,* 191 F.3d 360 (3rd Cir.1999), *cert. denied,* 529 U.S. 1023, 120 S.Ct. 1429, 146 L.Ed.2d 319 (2000); *United States v. Hotal,* 143 F.3d 1223 (9th Cir.1998); *United States v. Jackson,* 55 F.3d 1219 (6th Cir.1995). For instance, in *Jackson,* the Sixth Circuit sustained the validity of an anticipatory search warrant, which, like the search warrant for 714 Kirk Lynne Street, authorized officers to search a residence, if a package containing controlled substances was delivered to and taken inside of that residence. Nevertheless, Johnson contends that an anticipatory warrant, dependent upon the delivery of controlled substances to the place to be searched, ceases to be effective, if the contraband so delivered is removed from that structure, prior to the execution of the warrant. That argument is contrary to the Sixth Circuit's decision in *Jackson.* Therein, a law enforcement official, posing as a driver for a commercial shipping service, delivered to the defendant's residence a package which had previously contained a substantial amount of heroin.[12] Immediately after the package had been delivered and taken inside, the defendant left the residence with the package. Indeed, as the officers were in the final stages of preparing to execute the search warrant, they apprehended the defendant as he was climbing over a fence at

the rear of the property, with the unopened package in which the heroin had been shipped under his arm. Thus, before the residence was searched and any evidence seized, the contraband had been removed. After his arrest, the defendant moved to suppress the evidence, arguing, *inter alia,* that probable cause to search his residence had ceased to exist, upon the removal of the package in which the heroin had been shipped to that residence. After the District Court had overruled that motion and the defendant had been convicted, he appealed to the Sixth Circuit, raising the same argument. In affirming the defendant's conviction, the Sixth Circuit rejected his argument, concluding that "once the package was taken inside the [defendant's residence], probable cause existed to search the premises not only for the contraband itself, but also for other evidence of drug trafficking." 55 F.3d at 1224. Similarly, herein, given that Johnson took the boxes containing marijuana inside 714 Kirk Lynne Street, this Court, on the basis of *Jackson,* is compelled to conclude that probable cause to search that residence existed, notwithstanding the fact that the controlled substances had been removed from it before the search occurred.[13]

■ However, even if this Court were to conclude that probable cause to search 714 Kirk Lynne Street ceased to exist,

---

12. Before making that delivery, officers had removed most of the heroin, replacing it with a sham substance.

13. As Johnson points out, there are factual differences between *Jackson* and this case. For instance, the search warrant in *Jackson* was executed shortly after the package was delivered, while officers waited more than four hours before searching 714 Kirk Lynne Street. In addition, Jackson left with the package containing contraband, as soon as it was delivered to his residence. Herein, in

contrast, the boxes containing marijuana remained at 714 Kirk Lynne Street for approximately one hour before being moved. Those factual distinctions do not render inapplicable the core holding of *Jackson* that, once the package had been taken into the house, probable cause existed to search that residence both for the contraband itself and for evidence of drug trafficking, as well, even though the package containing the controlled substance was subsequently removed, prior to the execution of the search warrant.

once the cardboard boxes containing marijuana had been removed from that residence, *Leon* would prevent the suppression of the evidence seized therefrom. None of the four circumstances, under which *Leon's* good faith exception to the exclusionary rule will not apply, causes this Court to conclude that the evidence seized from 714 Kirk Lynne Street must be suppressed.

*First,* Johnson has not presented evidence that Hunt's affidavit contained a falsehood of the type identified in *Franks v. Delaware, supra.*

*Second,* Johnson does not suggest that Judge Merz abandoned his judicial role as a neutral and detached magistrate.

*Third,* Hunt's affidavit is not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon,* 468 U.S. at 923, 104 S.Ct. 3405. Indeed, such an argument would be difficult to mount, given the Sixth Circuit's statement in *Jackson.*

*Fourth,* the search warrant itself was not facially deficient. On the contrary, it identifies 714 Kirk Lynne Street as the place to be searched and the items to be seized are clearly identified in an attachment to the warrant.

Accordingly, based upon the foregoing, the Court overrules Johnson's Motion to Suppress Evidence (Doc. # 22).[14]

## II. Room 111 at the Knights Inn

Navirez–Ramirez and Sosa–Ramirez argue that the Court must suppress the evidence that was seized from Room 111, because the officers' initial entry into that room, which occurred before Hunt had obtained the search warrant for the room, violated their rights under the Fourth Amendment. The Government, on the other hand, argues that the initial entry was lawful, because it had been authorized by the search warrant Judge Merz had issued at 8:40 a.m., on March 6th, permitting officers to search 714 Kirk Lynne Street. In addition, the Government contends that the evidence seized from that motel room need not be suppressed because of *Leon* and, further, because that evidence was seized after a search warrant expressly authorizing a search of Room 111 had been issued by Judge Merz. Although the Court agrees with these Defendants that the officers' initial entry into Room 111 violated the Fourth Amendment and that *Leon* does not prevent the suppression of evidence seized as a result of that illegal entry, it cannot conclude that said violation serves as the basis for suppressing *all* evidence that was seized from that motel room, since that room was subsequently searched and evidence seized pursuant to a valid warrant issued by the Magistrate Judge. Rather, the only evidence that must be suppressed is that which was obtained during that illegal entry, to wit: the examination of these Defendants' hands under ultraviolet light which revealed the presence of clue spray thereon. The Court begins by setting forth its reasons for concluding that the initial entry into Room 111 violated the Fourth Amendment.

 As indicated, the Government contends that the initial entry into Room 111 did not violate the Fourth Amendment, because, by issuing the search warrant for 714 Kirk Lynne Street, Judge Merz authorized officers to enter any structure into which the two cardboard boxes of marijuana had been taken. This Court cannot

---

**14.** Given that the Court has concluded that the search of 714 Kirk Lynne Street did not violate the Fourth Amendment, it rejects Johnson's assertion that his statements must be suppressed as fruit of that poisonous tree.

agree. That search warrant merely provided that officers were authorized to search 714 Kirk Lynne Street. Moreover, in the application for the warrant, the Government did not expressly state that it was seeking permission to search any premises other than at that address. Nevertheless, the Government contends that the area which could be entered, under the authority of that search warrant, was expanded by virtue of ¶ 17 of Hunt's affidavit, quoted above. Since Hunt did not expressly state in that paragraph that he was seeking authority to search or to enter any location other than 714 Kirk Lynne Street (that officer merely stated that it would be necessary to enter a location into which the boxes were taken, rather than asking for permission to do so),[15] and that the application did not request such authority, this Court is compelled to conclude that Judge Merz did not authorize the entry into any structure, other than 714 Kirk Lynne Street, by issuing the search warrant for that location.

■ However, even if this Court were to interpret the search warrant as authorizing officers to enter structures other than 714 Kirk Lynne Street, it would conclude that such authority was in violation of the particularity requirement contained in the Fourth Amendment. In *United States v. Nafzger*, 965 F.2d 213 (7th Cir. 1992), the Seventh Circuit addressed an analogous situation. Therein, law enforcement officials obtained a search warrant for a Ford pickup truck which had been stolen, authorizing them to search for that vehicle anywhere in the Western District of Wisconsin. Acting on information that the pickup truck could be found at Nafzger's farm, officers went to that location and showed the search warrant to the defendant. He admitted that he had a pickup truck which matched the description and took the officers to a shed where the truck was located. The officers searched the pickup truck and discovered that it was the stolen vehicle described in the search warrant. The defendant subsequently admitted to the officers that he knew that the pickup truck had been stolen. After the defendant had been indicted for receiving stolen property which had traveled across state lines, he moved to suppress the evidence which officers had obtained from his farm. The District Court overruled that motion, after which the defendant entered a conditional plea of guilty. Upon appeal, the Seventh Circuit reversed, concluding that the search warrant issued for the pickup truck did not authorize the officers to search the defendant's farm, since that warrant violated the particularity requirement contained in the Fourth Amendment by failing to describe the place to be searched. The Seventh Circuit concluded that the search warrant, by describing the place to be searched as the Western District of Wisconsin, constituted a forbidden "general warrant."[16] The *Nafzger* court wrote:

15. Paragraph 17 of the initial affidavit must be contrasted with ¶ 12, wherein Hunt explicitly requested authorization to install monitoring devices in the two cardboard boxes. As is indicated in the text, Hunt did not request in ¶ 17, expressly or otherwise, permission to enter any structure other than 714 Kirk Lynne Street.

16. In *Payton v. New York*, 445 U.S. 573, 584 n. 21, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), the Supreme Court traced the roots of the

particularity requirement of the Fourth Amendment to the colonialists' objections to British writs of assistance and general warrants. In *Parkhurst v. Trapp*, 77 F.3d 707 (3rd Cir.1996), the court noted that the objections to general warrants predated the American Revolution: " '[t]o enter a man's house by virtue of a nameless warrant, in order to procure evidence, is worse than the Spanish Inquisition; a law under which no Englishman would wish to live an hour; it was a most daring public attack made upon the

By accepting "the Western District of Wisconsin" as a particular description of the place the truck was to be found[,] we would be giving the government carte blanche to search anywhere in that district that the truck might conceivably be found, condoning the use of the pernicious general warrant, and redacting the particularity requirement from the fourth amendment. The warrant used in this search was defective.

*id*, at 216. Similarly, herein, Hunt testified that he believed that the search warrant authorized him to enter any structure, within the Southern District of Ohio, into which the boxes of marijuana had been taken. The Government's premise is that ¶ 17 of Hunt's affidavit expanded the permissible area which could be entered, pursuant to the search warrant for 714 Kirk Lynne Street, to include Room 111 at the Knights Inn. If correct, it would be asking this Court to approve a general warrant and to delete the particularity requirement from the Fourth Amendment. Since the rationale employed and the result reached by the Seventh Circuit in *Nafzger* is both in accordance with the Fourth Amendment and persuasive, this Court follows that decision and concludes the search warrant at issue herein would have violated the Fourth Amendment, *if* it had authorized the entry into any structure into which the boxes of marijuana had been taken.[17]

Based upon the foregoing, the Court concludes that the officers' initial entry into Room 111 at the Knights Inn violated the Fourth Amendment.

■ Nevertheless, the Government argues that, even if the search warrant did not authorize the officers' initial entry into Room 111, *Leon* prevents the suppression of the evidence seized from that motel room. This Court cannot agree. The Court need only consider the fourth circumstance identified by the Supreme Court in *Leon*, under which the good faith exception to the exclusionary rule will not apply, i.e., where a search warrant is so "facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *See* 468 U.S. at 923, 104 S.Ct. 3405. A search warrant which, although containing a defect, was not facially defective can be seen by examining *Massachusetts v. Sheppard*, 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984), a companion case to *Leon*. Therein, officers, investigating a murder which the defendant was suspected of having committed, sought a search warrant for his residence. However, since it was a Sunday and the local courts were closed, they had difficulty obtaining a pre-prepared form for the warrant. As a consequence, they used such a form which stated that the search was authorized to

---

liberty of the subject.' " *Id.* at 711 n. 4 (quoting *Huckle v. Money,* 95 Eng. Rep. 768, 769 (1763)).

17. The case relied upon by the Government does not remotely support the proposition that such a search warrant would have complied with the Fourth Amendment. In *United States v. Gahagan,* 865 F.2d 1490 (6th Cir.), *cert. denied,* 492 U.S. 918, 109 S.Ct. 3242, 106 L.Ed.2d 590 (1989), the defendants argued that the District Court had erred in failing to suppress evidence which had been seized when a search warrant was executed at "Cab-

in # 3," because that warrant did not identify "Cabin 3" as a place to be searched. The Sixth Circuit rejected that argument, concluding that the search warrant complied with the particularity requirement, since Cabin # 3 was located on the property to be searched, which was set forth on the warrant, and, further, given that the affidavit executed to obtain the search warrant described the cabin. Herein, Hunt's affidavit did not describe Room 111. Indeed, Hunt was not even aware of its existence when he sought the search warrant for 714 Kirk Lynne Street.

seize controlled substances. The affidavit, which one of the officers had executed to obtain the search warrant, did, however, describe with particularity the evidence they were seeking, evidence which was unrelated to controlled substances. When the improper form of the warrant and the affidavit were presented to the magistrate, an officer informed that judicial officer that the warrant had to be changed, because it authorized the seizure of controlled substances, rather than certain, specific evidence of a murder for which they were searching. Unable to find a more suitable form, the magistrate told the officer that he would make the necessary alterations and issued the search warrant. The magistrate did not, however, change the portion of the warrant which authorized a search for controlled substances.[18] Although the trial court refused to suppress the evidence, concluding that the officers had acted in good faith reliance upon a search warrant issued by a magistrate, the Massachusetts Supreme Judicial Court reached the opposite conclusion, noting that the United States Supreme Court had not recognized a good faith exception to the exclusionary rule. Upon appeal, the Supreme Court concluded that the rule announced in *Leon* prevented the suppression of the evidence seized when the search warrant was executed. Thus, the Supreme Court held that the evidence which had been seized when the defective search warrant had been executed need not be suppressed, since the officers had acted under the good faith belief that the search warrant was valid. In support of its holding, the Supreme Court noted that the officers had informed the issuing magistrate of the problems with the form they had used for the search warrant and that the magistrate had indicated that he would

correct the problem. Herein, by contrast, there is no evidence that Hunt expressly informed Judge Merz that he was requesting authority to search any structure other than 714 Kirk Lynne Street. Indeed, the record of this prosecution is devoid of evidence that an error by Judge Merz caused the authority granted by the search warrant to be limited to that address. The Government, in arguing the good faith of the officers executing the warrant, is not relying upon *Leon* to correct a defect in a search warrant which could be traced to the issuing magistrate. Rather, it is attempting to employ the good faith exception to the exclusionary rule in order to justify a general warrant and, thus, to eliminate the particularity requirement from the Fourth Amendment. In the absence of any indication by the Supreme Court that such was its intent when it decided *Leon* or that other courts have so interpreted that decision, this Court is unwilling to amend the Fourth Amendment to reach such a result.

Moreover, the case relied upon by the Government is distinguishable. In *United States v. Watkins*, 179 F.3d 489 (6th Cir. 1999), officers obtained a search warrant, authorizing them to search a house located on a particular parcel of real estate. When that warrant was executed, the officers searched a second structure, also located on that parcel, seizing evidence therefrom. The defendant moved to suppress the evidence seized from the second structure, arguing that it had not been described in the search warrant as a place to be searched. The District Court overruled that motion, and the defendant appealed, after having been convicted. Upon appeal, the Sixth Circuit affirmed. Of particular present importance, the Sixth Cir-

---

18. Although the evidence to be seized was described with particularity in the affidavit, the lower courts concluded that the affidavit could not cure the defect in the warrant, since the affidavit had not been incorporated by reference into the search warrant.

cuit concluded that the search warrant was not facially deficient, since the affidavit upon which it had been based mentioned sheds and other buildings on the parcel of property. Although the Sixth Circuit concluded that the affidavit described the second structure with sufficient particularity, that court held that the affidavit did not cure the defect in the search warrant, because it had not been incorporated by reference into the warrant. Accordingly, the Sixth Circuit concluded that the search warrant was defective, since the second structure was not among the places described with particularity in the warrant to be searched. Nevertheless, the Sixth Circuit in *Watkins* applied *Leon* to conclude that evidence seized by the search of the second structure need not be suppressed, since that structure was described with particularity in the affidavit, thus giving the officers an objective, good faith belief in the validity of the warrant. Herein, the Government relies upon *Leon* to justify the entry into a motel room which was not known at the time the warrant was issued. Room 111 was no more described by Hunt's affidavit than any other structure in the Southern District of Ohio. Thus, this case does not involve an instance in which the executing officers could have believed in good faith that a defect in the search warrant was cured by the affidavit.

Accordingly, the Court concludes that the good faith exception to the exclusionary rule does not prevent the suppression of the evidence seized from Room 111.

■■■ Nevertheless, that conclusion does not inexorably cause the Court to suppress that evidence. It must be remembered that when the officers initially entered Room 111, they did not seize any physical evidence or conduct a search. Rather, at that point, they arrested Navirez–Ramirez and Sosa–Ramirez and secured the room. The search of Room 111 and the concomitant seizure of evidence contained therein (including the boxes of marijuana) did not occur until after Judge Merz had issued a second search warrant, one which expressly authorized officers to search that motel room. In instances where a search has been conducted pursuant to a search warrant, after a violation of the Fourth Amendment, courts have applied the independent source rule and have held that the remedy is not necessarily to suppress the evidence that was seized when the search warrant was so executed. *See Murray v. United States*, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988).[19]

19. In *Murray*, officers, conducting an investigation into suspected trafficking of controlled substances, observed the defendants drive two vehicles into a warehouse and then leave in those vehicles about 20 minutes later. As the vehicles left the warehouse, the officers observed a large tractor-trailer rig bearing a long, dark container. The defendants subsequently turned the vehicles over to other individuals, after which those vehicles were lawfully stopped and searched, with marijuana being discovered in them. When officers continuing surveillance at the warehouse were informed of those facts, they entered that building without a search warrant and observed numerous bales of marijuana in plain view. Subsequently, an officer executed an affidavit, with which he obtained a search warrant for the warehouse. The affidavit did not mention the prior illegal entry into the warehouse or the officers' observations during that entry. When the warehouse was searched pursuant to the warrant, the marijuana that had been seen during the initial, illegal entry was seized. The defendants moved to suppress the marijuana which the officers had observed during that first entry. The District Court overruled that motion, and the First Circuit affirmed. Upon further appeal, the Supreme Court affirmed, concluding that the independent source rule prevented the suppression of the marijuana which had been seen during the illegal entry. The independent source was the fact that the evidence had been seized as the result of the execution of a search warrant which had been obtained without using any information learned during

Rather, the tainted portions of the supporting affidavit (i.e., those portions which include illegally obtained information) must be redacted. If the remaining portions of the affidavit establish probable cause, then the evidence obtained as a result of the execution of the search warrant will not be suppressed, with the opposite result being reached if the remaining portions fail to establish the existence of probable cause.[20] *See e.g., United States v. Hassan,* 83 F.3d 693 (5th Cir.1996); *United States v. Shamaeizadeh,* 80 F.3d 1131 (6th Cir.1996); *United States v. Ford,* 22 F.3d 374 (1st Cir.), *cert. denied,* 513 U.S. 900, 115 S.Ct. 257, 130 L.Ed.2d 177 (1994); *United States v. Reed,* 15 F.3d 928 (9th Cir.1994); *United States v. Markling,* 7 F.3d 1309 (7th Cir.1993); *United States v. Herrold,* 962 F.2d 1131 (3rd Cir.), *cert. denied,* 506 U.S. 958, 113 S.Ct. 421, 121 L.Ed.2d 344 (1992).[21]

■ Applying that procedure herein, this Court concludes that after redacting the tainted portions of Hunt's second affidavit, the remaining portions easily establish the existence of probable cause to believe that evidence of trafficking in controlled substances would be found in Room 111 at the Knights Inn. Only ¶ 16 of Hunt's second affidavit contains tainted information. Therein, Hunt indicates that after the monitoring devices had activated at 2:45 p.m., officers entered Room 111, and the boxes, marijuana, monitoring devices and occupants of the room were secured. The Court will disregard all information in ¶ 16, after the statement that the monitoring devices had activated. The remaining portions of Hunt's second affidavit detailed the events which had occurred before the search warrant for 714 Kirk Lynne Street had been issued (i.e., that two cardboard

the illegal entry into the warehouse. As can be seen, the facts of *Murray* are quite analogous to those of the present prosecution.

20. Those procedures are similar to those which the Supreme Court adopted in *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), for addressing material misstatements in an affidavit.

21. Courts have also indicated that the officers' decision to seek a search warrant must not have been prompted by what they learned as a result of their violation of the Fourth Amendment. *See e.g., Markling,* 7 F.3d at 1315–16. Therein, the Seventh Circuit explained that resolution of this inquiry requires the District Court to decide whether officers would have applied for the search warrant, if they had not obtained information as a result of the violation of the defendant's Fourth Amendment rights. *Id.* Herein, the objective evidence causes this Court to find that the officers would have applied for a warrant to search Room 111, even if they had not observed the open boxes of marijuana when they illegally entered Room 111. Officers had learned that two cardboard boxes containing in excess of 56 pounds of marijuana had been shipped to 714 Kirk Lynne Street. They ar-

ranged a delivery of that contraband to that address and had observed it being taken inside. Subsequently, officers saw the cardboard boxes transferred to an automobile, which was driven to the Knights Inn. At that establishment, officers observed Defendants Navirez–Ramirez and Sosa–Ramirez carry the boxes into Room 111. The boxes had remained in that room. When the monitoring devices activated, the officers knew that the boxes had been opened. At that point, officers entered Room 111, which permitted them to confirm visually what they had previously learned from the monitoring devices, i.e., that the boxes had been opened. Given the knowledge that officers had obtained before their initial entry into Room 111 and, further, considering the diligence with which they had pursued their investigation, the Court finds that the officers would have applied for a search warrant for Room 111, even if they had not visually confirmed that the boxes had been opened when they initially entered the room. This finding is buttressed by the fact that no one could question that probable cause to search that room existed, without considering the information learned as a result of the initial, illegal entry. Therefore, the illegal entry did not "prompt" the officers to seek a search warrant.

boxes containing suspected marijuana, being sent to that address, had been discovered in El Paso, and that the suspected marijuana tested positive in Dayton). In addition, he indicated that monitoring devices had been installed in those boxes, that the boxes had been delivered to and taken inside of 714 Kirk Lynne Street, and that the two boxes had been transferred subsequently to the red Mazda, in which they were driven to the Knights Inn. At that motel, the boxes had been carried into Room 111, from which the monitoring devices had sounded at approximately 2:45 p.m. No one could question that those facts established probable cause to believe that marijuana would be found in Room 111.

Accordingly, the Court concludes that the evidence seized when officers executed the search warrant at Room 111 need not be suppressed.

■ However, the officers obtained other evidence as a result of their initial, illegal entry into that motel room. After entering that room and seizing Navirez–Ramirez and Sosa–Ramirez, officers examined their hands under ultraviolet light, in order to ascertain whether clue spray could be detected on them. Those examinations revealed the presence of that substance. Testimony concerning these examinations and their results could provide additional evidence linking these Defendants to the marijuana discovered in their motel room. It cannot be questioned that the Government obtained that evidence as a direct and proximate result of the illegal entry into Room 111. As such, that evidence is subject to the exclusionary rule. *See Segura v. United States*, 468 U.S. 796, 804, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) ("Evidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion."). The Government has neither argued, nor pointed to evidence in the Record, which would support a finding that evidence that the Defendants had clue spray on their hands would have been inevitably discovered. *See United States v. Leake*, 95 F.3d 409, 412 (6th Cir.1996) (noting that the Government has the burden of proof under the inevitable discovery doctrine). Therefore, this Court must suppress the results the officers obtained when they examined the hands of Navirez–Ramirez and Sosa–Ramirez under ultraviolet light.

Accordingly, based upon the foregoing, the Court sustains in part and overrules in part the Motions to Suppress Evidence filed by Navirez–Ramirez (Doc. # 20) and Sosa–Ramirez (Doc. # 23). Those motions are sustained as they relate to the results of the examination of those Defendants' hands for clue spray. Otherwise, those motions are overruled.

Counsel listed below will note that the Court has scheduled a telephone conference call for Thursday, December 21, 2000, at 9:00 a.m., for the purpose of selecting a new trial date for this prosecution.